**In re Frank P. RADLOFF, Debtor.**

**Judy Bernhardt, Plaintiff,**

v.

**Frank P. Radloff, Defendant.**

**Bankruptcy No. 08–50192.
Adversary No. 08–5013.**

United States Bankruptcy Court,
D. Minnesota.

Oct. 8, 2009.

Judy Bernhardt, pro se.

Walter W. Vasil, Duluth, MN, for Defendant.

## MEMORANDUM DECISION AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court for trial. The Plaintiff ("Ms.Bernhardt") appeared *pro se.* The Defendant ("the Debtor") appeared personally and by his attorney, Walter W. Vasil. After the close of the Plaintiff's case in chief, the Court declined to grant the Defendant's motion for judgment on partial findings as to the Plaintiff's objection to discharge under 11 U.S.C. § 727(a)(4)(A). The Court then received evidence from the Defendant, and took the matter under advisement after the record was closed. Upon the evidence received and the parties' arguments, the following decision is memorialized pursuant to FED. R.CIV.P. 52(a), *as incorporated by* FED. R. BANKR.P. 7052.

### THE PARTIES, AND THE DISPUTE BEFORE THE COURT

The Debtor filed a voluntary petition for relief under Chapter 7 on March 11, 2008. Ms. Bernhardt is a scheduled creditor of the Debtor. On February 19, 2004, Ms. Bernhardt had obtained a judgment against the Debtor in the amount of $1,905.88 in the Conciliation Court for the Sixth Judicial District, State of Minnesota. The underlying debt arose in 2002, when the Debtor, a flooring installer, contracted

with Ms. Bernhardt to level a concrete floor previously mislaid by another contractor. The Debtor took a cash deposit from her; but he never even started the job, and never refunded the deposit. In early 2008, Ms. Bernhardt was actively pursuing proceedings supplementary to execution on the judgment. An order to show cause was issued on her allegation that the Debtor failed to make proper post-judgment disclosure. The hearing on it was stricken after the Debtor's bankruptcy filing.

Ms. Bernhardt timely commenced this adversary proceeding.[1] Her initial letter-complaint was not entirely clear, but the Court early construed it as requesting two alternate forms of relief against the Debtor: a denial of the general discharge of debts in his bankruptcy case, and an exception for his debt to her from any discharge that would be granted to him. Trial convened on both requests for relief; the objection to discharge is now up for decision.[2] In sum, Ms. Bernhardt accuses the Debtor of having submitted a bankruptcy petition, statements, and schedules that contained numerous false recitations as to a variety of required disclosures.

█ In her letter-complaint, Ms. Bernhardt did not cite a statutory basis for a denial of discharge. At the scheduling conference, the Court ruled that her complaint would be treated as one sounding under 11 U.S.C. § 727(a)(4)(A). In its full text, that statute provides for the denial of a discharge under Chapter 7 where "the debtor knowingly and fraudulently, in or in connection with [the debtor's bankruptcy] case ... made a false oath ..." In her trial brief, Ms. Bernhardt relies on this statute throughout.[3]

## SUMMARY OF GOVERNING LAW

█ Section 727(a)(4)(A) is on the statute books to promote the integrity of the bankruptcy process. *In re Korte,* 262 B.R. 464, 474 (8th Cir. BAP 2001); *In re Sears,* 246 B.R. 341, 347 (8th Cir. BAP 2000). *See also In re Harris,* 385 B.R. 802, 805 (1st Cir. BAP 2008). When filing for bankruptcy, a petitioning debtor is required to disclose, in writing, his debts, his assets, his income and expenses, and numerous other aspects of his financial history and condition. 11 U.S.C. §§ 521(a)(1)(A) and (B)(i)-(vi). This disclosure is made in the form of verified statements and schedules, on forms prescribed by the Judicial Conference of the United States. The verification has the force and effect of an oath under 28 U.S.C. § 1746; so, the submission of such documents with false content constitutes a false oath. *In re Korte,* 262 B.R. at 474; *In re Sears,* 246

---

1. She did so by mailing a ten-page letter of complaint, with fourteen pages of documentary attachments, to the Duluth office of the clerk of this Court. Apparently she sent it to the trustee of the Debtor's bankruptcy estate also. Upon receiving this, the clerk followed the standard practice for administration of such communications, and treated it as a complaint under Fed. R. Bankr.P. 7001(4). An adversary proceeding was opened for the complaint, and a summons issued. The Debtor, through counsel, interposed an answer. A scheduling conference was conducted and an order for trial was issued.

2. After the close of the evidence, the Court granted the Debtor's motion for a judgment on partial findings on Ms. Bernhardt's request for a determination of nondischargeability. She had not produced any evidence to prove that he had incurred the debt in the first instance by committing an act of fraud.

3. She also cites various provisions of 18 U.S.C. § 152. That statute, however, governs the federal criminal offenses of concealment of assets and the giving of false oaths in connection with a bankruptcy case. An objection to the grant of discharge in bankruptcy is purely a civil proceeding; a statute governing a criminal offense does not apply to it.

B.R. at 347; *In re Mathern*, 137 B.R. 311, 327 (Bankr.D.Minn.1992), *aff'd*, 141 B.R. 667 (D.Minn.1992).[4] "The entire thrust of an objection to discharge because of a false oath ... is to prevent knowing fraud or perjury in the bankruptcy case." *In re Wills*, 243 B.R. 58, 63 (9th Cir. BAP 1999). The underlying thought is that a debtor must take all reasonable means to see that "the petition, including schedules and statements, [is] accurate and reliable, without the necessity of [the trustee and creditors] digging out and conducting independent examinations to get the facts." *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992).

■ To merit denial of discharge under § 727(a)(4), a debtor's misrepresentation or omission must be material; that is, it "must bear[ ] a relationship to the [debtor's] business transactions or estate, or concern[ ] the discovery of assets, business dealings, or the existence and disposition of [the debtor's] property." *In re Olson*, 916 F.2d 481, 484 (8th Cir.1990) (citation and interior quotes omitted). "The value of omitted assets is relevant to materiality, but materiality will not turn on value." *In re Sears*, 246 B.R. at 347 (citing *In re Olson*, 916 F.2d at 484). Nondisclosure of an asset of relatively modest value, or a false recitation as to it, can still be considered "material," as long as the asset became property of the bankruptcy estate by operation of 11 U.S.C. § 541(a). *Mertz v. Rott*, 955 F.2d at 598. And, the fact that the particular asset could have been claimed as exempt does not deprive the omission or false scheduling of materiality. *Id.*

■ A plaintiff under § 727(a)(4) must prove that the debtor acted both "knowingly and fraudulently," in omitting the asset from his bankruptcy filing or in making a false notation as to it. *E.g., In re Korte*, 262 B.R. at 471 and 474 (under § 727, plaintiff has burden of proof on all elements under statute, and under § 727(a)(4) must prove that "false statement [on schedules was] both material and made with intent"). Put another way, the question is whether the debtor "intended to deceive any recipient or reader of [the debtor's] statements and schedules ..." *In re Sears*, 246 B.R. at 350. Under the statute, the debtor's knowledge and intent are issues of fact. *In re Olson*, 916 F.2d at 484.

■ Two factors go to a debtor's state of mind under the "knowledge" element of the statute's scienter requirement. The first is the debtor's awareness of his own interest in, or claim to, an asset material to the bankruptcy process, or his actual knowledge of the occurrence of a past event or condition in his financial history that is to be disclosed. The second is the debtor's understanding that he was required to disclose the specific points of information on his statements and schedules. *See In re Bauder*, 333 B.R. 828, 831 (8th Cir. BAP 2005) (excusing debtor for initial omission from asset schedules of listing for ring in daughter's possession because she "believed (even if in error) that she only had to disclose items in her possession").

■ As to the fraud element, the inquiry is whether the Debtor intended to induce the reader or recipient of the statements and schedules, to a particular course of action or forbearance, via reliance on the omission or misrepresentation

---

**4.** The Eighth Circuit Court of Appeals and the Bankruptcy Appellate Panel for the Eighth Circuit have assumed this basic proposition without comment; most of their published decisions under § 727(a)(4) have involved debtors' recitations on the face of their bankruptcy statements and schedules.

in the document's entries. *In re Dupree,* 336 B.R. 490, 494 (Bankr.M.D.Fla.2005) (to determine fraudulent intent under § 727(a)(4)(A), court "must analyze the omissions or nondisclosures as to whether they were part of a scheme on the part of the debtor to retain assets for his own benefit at the expense of his creditors").[5]

■ As with all situations where a party's subjective state of mind is material to a claim or defense, the court may make inferences as to the specific facts going to the identified element of § 727(a)(4), from the more basic facts and circumstances that the record establishes. *See In re Sherman,* 67 F.3d 1348, 1353 (8th Cir. 1995) (noting debtor's actual fraudulent intent may be determined by process of inference, for purposes of 11 U.S.C. § 548(a)(1)).[6]

### APPLICATION, TO PLAINTIFF'S EVIDENCE AND ARGUMENT[7]

To start, it is necessary to isolate the basis on which Ms. Bernhardt finally submitted her objection to discharge for decision, i.e., the particular statements in the Debtor's bankruptcy filing. In her original letter-complaint, she maintained:

... one can clearly see that his statements are untrue, fraudulent, contradicting or, at the least, questionable.

Since there are so many issues I have separated the issues by schedules, forms, etc....

In the following seven pages, she quoted from sections of various documents in the Debtor's bankruptcy filing, and compared them to corollary statements in a financial disclosure form that the Debtor had given in the supplementary proceedings in the state court. Then she laid out the reasons why she impugned the recitations in the bankruptcy filing as fraudulent. She did not number these instances. There appear to be twenty-nine, or perhaps thirty, such.

When Ms. Bernhardt filed her trial brief, she opened her "Argument" section with:

The following is **only** a partial listing of the false answers, incorrect answers, missing answers, contradicting answers, and questionable answers to statements in Mr. Radloff's *Initial Bankruptcy Petition.* Total number is in excess of 140 (one hundred forty).

She went on to enumerate the instances of alleged fraud on which she would rely at trial, in numbered paragraphs. These appear to total forty-nine. She does not indicate where the remaining ninety-one "false answers, incorrect answers, missing answers, contradicting answers, and questionable answers" lie in the documents of the Debtor's bankruptcy filing.

With the length of these recountings, it was not easy to orient Ms. Bernhardt's evidence to her written argument.[8] The

---

5. This focus on inducement is a commonly-used way to illuminate the nature of fraudulent intent, reduced to its essence in the *function* of a scheme of artifice. *E.g., In re Hunter,* 771 F.2d 1126, 1129 (8th Cir.1985); *In re Swan,* 156 B.R. 618, 623 n. 6 (Bankr.D.Minn. 1993); *In re Gibson,* 149 B.R. 562, 572 (Bankr.D.Minn.1993) (all applying 11 U.S.C. § 523(a)(2)(A)).

6. The law permits this sort of derivative fact-finding, in light of common sense, probability, and general human experience. Direct evidence of a party's state of mind—by overt admission or otherwise—is very rare.

7. This section will contain mixed findings of fact and conclusions of law, organized by the specific instances of false statements that Ms. Bernhardt identified at the time of trial.

8. Her only witness at trial was the Debtor.

Debtor's counsel thus had a challenge in framing up his case for the defense, including his closing argument. In the end, the way he organized his response does reflect the proof that the Plaintiff brought forth, in an adequate fashion, and it furnishes a framework for analysis.

As it turns out, Ms. Bernhardt's evidence is relevant to nine classes of possible false oaths within the Debtor's bankruptcy filing. Thus, the factual bases on which her objection will be treated will be limited to those identifiable from the evidence in the record. As to all of the other accusations she made in her pre-trial submissions, she failed to meet her burden of proof; so, under applicable law no further discussion is warranted as to them. *See In re Sendecky,* 283 B.R. 760, 762 (8th Cir. BAP 2002), aff'd, 65 Fed.Appx. 99 (8th Cir.2003); *In re Korte,* 262 B.R. at 471 (complaining creditor has burden of proof on its objection to discharge).

### 1. Statements of Amounts of Debtor's Business Income in Means Test Calculator.

As part of his initial bankruptcy filing, the Debtor submitted a Chapter 7 Statement of Current Monthly Income and Means Test Calculation form (commonly termed "the Means Test calculator").[9] For item 3 of his Means Test calculator, the Debtor recited $400.00 as the amount of his "Gross wages, salary, tips, bonuses, overtime, commissions." It is undisputed that the Debtor did not derive income as an employee of an employer during the six months prior to his bankruptcy filing, or at the time of it. To the extent that he had

income in his own right, it was solely from home-repair or-improvement work he did on a casual, cash basis for individual customers, and apparently on limited occasions.[10] He left blank the lines under item 4 of his Means Test calculator, "Income from the operation of a business, profession or farm."

On November 12, 2008, after this adversary proceeding had been scheduled for trial, the Debtor filed a number of amendments of the documents in his original bankruptcy filing. In the amended version of his Means Test calculator, he did not recite an amount for "Gross wages, salary," etc. for himself. Under item 4 he recited gross monthly business receipts of $1,714.00 and monthly business expenses of $1,269.00, resulting in "Business Income" of $445.00 per month.

At trial, Ms. Bernhardt focused closely on the lack of any suggestion in the original Means Test calculator that the Debtor's personal income was from self-employment. She then took considerable time to point out that he had recited $800.00, in round numbers, as the amount of his monthly income on the financial disclosure form he had submitted to the state court. During a long oration on this point, she went back and forth between the two documents' recitations, with many insinuations about how it was impossible to determine which was a correct reflection of the Debtor's income, or whether an average of $600.00 was an accurate amount. However, she did not pose a question to the

---

9. This form has been required of individual debtors under Chapter 7 since the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8 ("BAPCPA"). It is responsive to the inquiry that is to be made under the amended (and now much more complicated) provisions

for possible dismissal of a case as an abuse of Chapter 7 remedies, and in particular to the BAPCPA-created presumptions set forth in 11 U.S.C. §§ 707(b)(2)(A)-(C).

10. The Debtor testified that he has been self-employed as a flooring installer since 1975.

Debtor to that effect for some time.[11] When she did, the Debtor responded that:

a. His identification of $200.00 per week as his "total wages, salary, or commissions" in the state court's financial disclosure form was his most accurate estimate of his business revenues, to the best of his knowledge, as of the November 7, 2007 date on which he had signed it;

b. He had relied on his bankruptcy attorney to calculate the amount of his actual income for the six-month period contemplated by the Means Test calculator, from the raw data of receipts and expenses he had given him, as well as his own rough estimate that the six-month average was $400.00, net;

c. He had assumed that the $400.00 figure was a proper reflection of his net income from his own estimate and his attorney's calculation, for that six-month period; and

d. When he submitted both forms, completed, he believed that he had followed the instructions for them.

■ Ms. Bernhardt's evidence on this point does not support a finding that the disclosure of the raw amount of income on the Debtor's Means Test calculator was materially false. Nor does it support findings that he acted knowingly and fraudulently in subscribing to the statement.

The recitation of $400.00 as the six-month average amount of his personal earnings seems to have resulted from a somewhat rough calculation by his attorney, done to check the Debtor's own estimate in the same amount. When counsel went back to do the math from specific data in a more exacting fashion during the pendency of this adversary proceeding, the outcome (a $455.00 average) was not materially different from the originally-recited number. Ms. Bernhardt's only evidence to challenge either one as false was the Debtor's recitation of income of $200.00 per week on the state-court financial disclosure form. That document was executed some five months before his bankruptcy filing; its requested disclosures were premised on a different and simpler legal standard for the determination of the relevant amount. Her point seems to be that one or another of these three statements had to be false. In her opinion, it was the bankruptcy-related disclosures.

■ The difference in the three answers is at least as likely to be the result of different basic circumstances prevailing during the times relevant to each disclosure (i.e., more or less work actually undertaken by the Debtor, higher or lower expenses related to jobs for customers). Given the equal probability of possible explanations, Ms. Bernhardt did not meet her burden by the greater weight of the evidence; she did not prove that it was more likely than not that the Means Test calculator was false in this regard, for the period of time it concerned.[12] If anything, the more detailed calculation for the amended Means Test calculator, by roughly corroborating the initial bankruptcy dis-

---

11. Ms. Bernhardt also hectored the Debtor and his attorney as to the base period that they had used to determine the gross amount of the Debtor's business receipts, for the calculation of "Current Monthly Income" on the Means Test calculator. From the Debtor, she only got the answer that he didn't understand her question, as intertwined as her wording was with the opaque jargon of the form.

From counsel she got a statement that he had prepared the forms after doing the calculation, as he believed the law required, from the information his client had given him.

12. The evidentiary burden on a plaintiff under § 727 is to prove the case by a preponderance of the evidence. *In re Korte*, 262 B.R. at 471.

closure, showed it was more likely than not that both bankruptcy-related recitations reflected the Debtor's income for the retrospective analysis of the Means Test. The legal standard in bankruptcy was distinct from the "snapshot," single-point disclosure prescribed by the simple language of the financial disclosure form. As a result, the content of the state-court disclosure was only marginally relevant to the accuracy of the Means Test calculator.[13]

Ms. Bernhardt's evidence does not preponderate on the issue of intent, either. The uncontroverted evidence is that the Debtor gave the relevant, raw data to his attorney with his rough estimate of his income for the relevant period, and then relied on the attorney's expertise for the input into the Means Test form. Counsel's initial work of calculation was not as thoroughgoing as it should have been; but, it clearly corroborated the Debtor's rough estimate. Thus, the Debtor's reliance in fact on counsel to complete the form in a way responsive to the statutory requirements bolsters a finding of no knowledge or fraudulent intent on the Debtor's part. *In re Sendecky*, 283 B.R. at 765; *In re Barrows*, 399 B.R. 506, 512–513 (Bankr. D.Minn.2009). *Cf. In re Markey*, 378 B.R. 594, 603–604 (Bankr.D.Minn.2007).

Finally, the error on the initial Means Test calculator as to the source of the Debtor's personal income, as between self- or third-party employment, and the lack of the detail attendant to a netting of business income, are just not material—however erroneous they were as a reflection of the actual circumstances. The Debtor's initial Schedule I, filed at the same time as his Means Test calculator, explicitly disclosed his self-employment. There is no statement in any part of the original schedules that contradicts a self-employed status. The error obviously is attributed to counsel or counsel's staff, and to an incomplete review of the form's minute detail by counsel and Debtor alike.

None of that resonates with fraud on the Debtor's part. The application of § 727(a)(4) does not require the draconian, zero-tolerance execution of a technical-compliance fiat. *Cf. In re Bauder*, 333 B.R. at 832 (for the purposes of § 727(a)(4), "[t]he omission of property of trivial value is immaterial").

## 2. Omission of Spouse's Income from Original Schedule I.

Ms. Bernhardt's next point was that the Debtor's original Schedule I left blank all entries under which the Debtor should have disclosed his wife's income from her employment as a beautician, and all deductions and expenses related to that employment. This, she argued, rendered Schedule I **"false,"** given the facial instruction of the Official Form that "the column labeled 'Spouse' must be completed in all cases filed by ... every married debtor, whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed."

In that specific regard, Ms. Bernhardt had a point. The instruction for Schedule I unequivocally requires a married debtor, whose spouse is not joining in the bankruptcy filing, to disclose his full household's financial means in the form of income, including all earnings of a non-filing spouse. So, the schedule was false, as a reflection of the actual facts as they stood on the date of the Debtor's bank-

---

**13.** The complexities of calculating "Current Monthly Income" under the Means Test form for the purposes of 11 U.S.C. § 707(a)(2)(A)(i), by applying 11 U.S.C. § 101(10A)(A), have bedeviled attorneys, parties, and judges alike since the effective date of BAPCPA.

ruptcy filing.[14] However, Ms. Bernhardt did not prove that the Debtor presented the form with knowledge or fraudulent intent. The Debtor had relied on his attorney to see that this form's disclosures complied with legal requirements. His attorney candidly stated that in his own years of bankruptcy practice he had always assumed that the income of a spouse not joining in a bankruptcy petition need not be disclosed on Schedule I.[15]

█ It is a little puzzling that counsel missed the instruction at the top of Schedule I, and apparently had for years. The directive has been there since the first version of the form was proposed in 1991. But it is not untoward that the Debtor did not see it; it is in small print at the top of a somewhat complicated grid. Further, the Debtor's reliance on his attorney's completion of the form's entries was not unreasonable, under the considerations noted earlier. And, most tellingly, the amount of the Debtor's wife's income was disclosed in Column B of Part II of the Means Test calculator (albeit in the wrong place, item 10.a. rather than item 3). In that form, it was fully factored into the analysis for the presumption of § 707(b)(2)(A)(i). This disclosure was adequate in context. It is clear evidence that the Debtor did not intend to secrete the fact of his wife's income generation.[16] That overcomes any possible inference of knowledge or fraudulent intent to be made from the absence of this information from Schedule I.

### 3. Alleged Deficiencies in Business–Related Recitations.

█ A third grouping within Ms. Bernhardt's contentions consists of points that go to peripheral aspects of the Debtor's past involvement in business. During the Debtor's testimony, she reviewed with him a laundry list of assumed business names. She got his acknowledgment that he had neglected to disclose on the petition page of his filing that he had done business under an assumed name of "Rolling Thunder" for some sort of one-time endeavor in 2001, and that he had not recited his connection with a business called "The Cutting Edge." He had ended his ownership of the latter more than eight years previously.

However, Ms. Bernhardt introduced no proof that the Debtor still had assets or debts borne of either of these two named business activities, in 2008. Thus, the omissions were not material under *Mertz v. Rott*.

Beyond that, the Debtor denied having any position with a magazine called *Up North*; and he had no knowledge of being known as "Frank Randloff" in any business activity.

---

**14.** Unlike the Means Test calculator, which requires a calculation of "Current Monthly Income" on a retrospective basis under the definition of 11 U.S.C. § 101(10A)(A), Schedule I is to reflect the state of a debtor's income as of the date of the bankruptcy filing. *In re Forbish*, 414 B.R. 400, 402 n. 1 (Bankr. N.D.Ill.2009); *In re Odom*, 406 B.R. 911, 913 n. 3 (Bankr.D.Colo.2009).

**15.** And, somewhat surprisingly, counsel stated that he had never been challenged on his practice of omitting it, whether by a panel trustee, the United States Trustee, or any other party in interest.

**16.** "A debtor's subsequent disclosure [via amendment of a statement or schedule] does not absolve a debtor from an initial omission, but depending on the circumstances, it may be evidence of innocent intent." *In re Bauder*, 333 B.R. at 831. The exculpatory effect to be given to an alternate disclosure of subject matter omitted elsewhere has to be greater when the two variant recitations are in the same, single document filing.

Ms. Bernhardt noted that the Debtor had not checked a box under the entry for "Nature of Business" on the petition page, and he had checked the box for "Debts are primarily consumer debts . . ." under "Nature of Debts" rather than "Debts are primarily business debts." To the extent that Ms. Bernhardt would have the first of these points considered as evidence of fraudulent concealment, the omission was de minimis. The recitations on Schedule I and items 1 and 18 of the Debtor's Statement of Financial Affairs disclose well-enough that he had been engaged in business pre-petition.

 As to the second item, Ms. Bernhardt pointed out that, under her calculation, at least 60% of the total of the Debtor's scheduled debt was business-related. Her point was that he should have checked the other box. Assuming her breakdown of the nature of debt to be correct, yes, the designation was inaccurate and the response was sloppy at best. But, for the reasons noted earlier, the error is neither material, nor evidence of fraud on the Debtor's part.[17] And, he credibly testified that he had relied on his attorney's analysis for the way these items were completed for his execution.

### 4. Non-disclosure of Debtor's Alleged Interest in Real Estate Where He Resided.

 In her trial brief, Ms. Bernhardt stated, as to the Debtor's Schedule A: Mr. Radloff claims he has no future interest in any real estate. In the event

Mr. Radloff's Spouse precedes him in death; Mr. Radloff may have [a] future interest in his Spouse's real estate.

She broached this issue at trial, seeking to impugn the Debtor for not having listed an inchoate interest in a dwelling place as an asset. The Debtor's counsel made an offer of proof that the real estate in question was titled solely in the Debtor's wife, and had been since purchase. Ms. Bernhardt conceded the state of title per that offer. Given that, on the authority of *In re Johnson,* 210 B.R. 153 (Bankr.D.Minn. 1997), the Court ruled from the bench that Minnesota law would not recognize an estate in land vested in the Debtor, arising solely from his ongoing marriage to the one record holder of title; hence, the Debtor's Schedule A was not even false.

### 5. Alleged Inaccuracy and Incompleteness of Schedule F.

 Ms. Bernhardt also called attention to a number of aspects of the Debtor's Schedule F, for "Creditors Holding Unsecured Nonpriority Claims." In a technical sense, most of them do reflect facial incompleteness within this schedule. But, every one of these deficiencies is not material, or it was not the product of fraudulent intent on the Debtor's part:

a. For most of the unsecured claims on this schedule, the Debtor did not give an "Account No." in the blank for that information. He testified that he gave his lawyer a list of creditors with the detail as to each

---

17. If anything, the mistake could have had an effect contrary to the Debtor's interest in achieving a quick discharge in a perfunctory and uncontroverted bankruptcy case. The mandated response to this query seems to function as a cue to the United States Trustee and other reviewing parties, as to the possible applicability of 11 U.S.C. § 707(b)(1) and its remedy of dismissal for abuse of Chapter 7 by

a consumer-debtor. Under Ms. Bernhardt's analysis of the Debtor's debt structure, a motion for dismissal under that statute would not have even been available to the United States Trustee or creditors; Congress apparently chose to give failed business entrepreneurs a free pass from the whole notion of an abusive bankruptcy filing, insofar as that statute's governance is concerned.

debt that counsel requested, and that his attorney did not ask for account numbers. There is nothing to indicate fraudulent concealment in this testimony, and there was no other evidence to support such a finding as to this category of disclosure.[18]

b. Similarly, the Debtor did not give a "Date Claim was Incurred" for any debt. (He did give brief descriptions of the "Consideration for Claim," as requested in the same blank.) The reason for not deeming fraudulent intent noted on the matter of account numbers applies to this omission with equal strength.

c. The Debtor did not complete the blank to indicate liability as among "Husband Wife Joint or Community" for any listed debt. As a technical matter, he was not required to do so. This was not a joint case. In fact, the Debtor would have had no business scheduling debts that were his wife's liability alone.[19]

d. The Debtor's Schedule F lacked entries for four creditors whose unse-

cured claims were unsatisfied when he filed for bankruptcy. Ms. Bernhardt located these creditors through a local judgment search under the Debtor's name. He testified that he had forgotten about these four debts, in particular because two of them had "gone out of business a long time ago." This was credible enough—logically, the Debtor would not have been dunned by the defunct creditors in recent memory. His testimony established a lack of fraudulent intent on his part.[20]

e. Finally, Ms. Bernhardt pointed out that some of the debt-entries appeared to double-book for a creditor itself and a collection agent or collecting attorney, with a duplication of amounts owed. She insinuated that the Debtor had tried to inflate the semblance of his insolvency by doing this. She produced no other evidence to support that. While the double-scheduling of an amount due was technically incorrect, it was not material.[21]

---

**18.** As an aside, it must be observed that the requirement for this sort of information under this blank of the Official Form is honored far more in the breach across the bankruptcy courts' docket than it was a decade or two ago. Even when it was a matter of attorneys' imprecision, this did not lead to a bad result, in these days of universal electronic access to bankruptcy court records and sophisticated identity-theft and criminal computer hacking schemes. And currently, pursuant to 11 U.S.C. § 107(c)(1)(A), the policy of the Judicial Conference of the United States requires parties filing papers in bankruptcy cases to redact financial account numbers from them.

**19.** He did include the mandatory Schedule H, for co-debtors, in his filing, though he indicated on it that he had none such on any scheduled debt.

**20.** Though such an omission was material under *Mertz v. Rott,* the phenomenon of ini-

tially-omitted creditors goes with the territory of bankruptcy; disorganization and poor record-keeping is endemic with individuals who fall into financial distress. Court rules recognize this, and prescribe the means by which such creditors are to be notified of the bankruptcy filing and case pendency when their claims are discovered post-petition. *See* Loc. R. BANKR.P. (D. MINN.) 2002–1(d) and 1009–1(c).

**21.** Attorneys representing individual debtors customarily list collection agents or collecting attorneys for scheduled creditors, and include them on the address matrix for the case. They do so to see that these third parties are put on notice of the case, which triggers an obligation to cease collection efforts against their debtor-clients. This is not only a prudent thing to do, in the abstract. Failing to do so might be professional negligence on the attorney's part, if actual, permanent harm to

### 6. Allegedly–Omitted Personal Property.

In her pretrial briefing, Ms. Bernhardt described a number of assets that she alleged were in the Debtor's possession and under his ownership, but that he did not schedule or under-valued. She identified these assets through title searches and, apparently, a surveillance of the Debtor's yard. In the last instance, her evidence failed to establish that the Debtor was secreting any asset in his bankruptcy filing, whether by ownership, under-identification, or under-valuation:

a. A Chevrolet van, year not specified, license number HJN 771: The public motor vehicle registry in Minnesota still had this vehicle extant under the Debtor's name as owner, and the Debtor acknowledged that he retained a title card for it; however, he testified without controversy that he had "junked it a long time ago."

b. A boat or boats in the Debtor's backyard: The Debtor testified, briefly and again without controversion, that the boats belonged to his neighbor and had been parked there with his permission. Ms. Bernhardt produced no evidence of ownership in the Debtor or registered title in his name.

c. Household goods: The Debtor scheduled household goods of a total value of $5,000.00, but he did not itemize them. At trial, he gave a brief description of six or eight types of furniture and tools, plus a computer (or possibly two). The evidence gave no support at all to any fraudulent characterization of the Debtor's original scheduling. Contrary to Ms. Bernhardt's insinuation, there was no evidence that the computer(s) had any significant value at all.

So, as to these items, the scheduling was technically incomplete, or not sufficiently itemized, but it was not materially false.

### 7. Possibility of Unscheduled Self–Employment Tax Liability.

Building on her attempt to reconstruct an increased amount for the Debtor's net business income, Ms. Bernhardt took him to task for not scheduling a claim in favor of the Internal Revenue Service for self-employment income. Her wandering cross-examination of the Debtor did not make sequential sense, and it did not bear out the calculations that she summarized in her trial brief. There was no evidence that the Internal Revenue Service had ever taken steps to assess such a liability against him. So it is not possible to rule that the Debtor even had such a liability, let alone that he fraudulently failed to schedule one.[22]

### 8. Omission of Ms. Bernhardt's Proceeding Supplementary from Statement of Financial Affairs.

Ms. Bernhardt seemed to take special umbrage at the state of item 4 of the Debtor's Statement of Financial Affairs. That provision calls for the disclosure of all "Suits and administrative proceedings, executions, garnishments and attachments." The Debtor did not disclose the proceedings supplementary that Ms. Bernhardt had been pursuing against him immediately before he filed for bankruptcy.

---

the client resulted from ongoing collection action.

22. In any event, such a liability would be excepted from discharge under 11 U.S.C. § 523(a)(1)(A), under its incorporation of 11 U.S.C. § 507(a)(8)(A).

She is absolutely correct that the omission (and the checking of the item's box for "None") made this entry false. The Debtor testified that his attorney was quite aware of the state court proceedings; the Debtor had consulted him first about defending in the state court, and then received his advice to file for bankruptcy in light of his larger problem with insolvency.

The character of the state-court proceedings are a clear match to the subject of the entry; but, since this is a matter of technical legal knowledge, the initial failure is attributed to counsel. The Debtor's failure to recognize the omission is a closer case on the element of knowledge than virtually any of the other omissions Ms. Bernhardt impugns. However, in the last instance, there is no basis on which to infer an intent on his part to hide the pendency of her proceedings from all of the other constituencies to his case.

### 9. Lack of Amendment to Statutory Summary.

■ Ms. Bernhardt's last contention stems from the fact that the Debtor did not file an amended Form 6, "Statistical Summary of Certain Liabilities and Related Data (28 U.S.C. § 159)," with the amended schedules that he filed on December 2, 2008.

In the abstract, she is correct; the Debtor and his counsel should have changed at least one or two of the numerical totals on the original version of this form and filed an amendment. The addition of four creditors (and possibly other changes to the original schedules) would have resulted in different totals.

However, any semblance of the totals that persisted from the presence of the original Statistical Summary in the record was truly not material under the standard in *Mertz v. Rott*. The Statistical Summary does not have any informational content that is not present elsewhere in a debtor's statements and schedules. It only collates the totals of certain values—debts and income—from other documents. It serves purposes that are solely internal to the federal courts: the obligation of the Administrative Office of the United States Courts under 28 U.S.C. § 159 to compile data on the ongoing experience in bankruptcy cases nationwide.[23] It has no utility whatsoever to the administration of the estate, or to the actual function of the bankruptcy process as to the real-life constituencies to a case.

### CONCLUSION

Those are all the bases for a possible denial of discharge under 11 U.S.C. § 727(a)(4) that can be gleaned from the record Ms. Bernhardt made at trial. They are properly deemed the only subjects for a formal ruling now. Not a one of them satisfies the requirements for the severe remedy of denial of discharge. The Debtor is entitled to a judgment in his favor.

This was not a long trial, but it was not an easy one either. Clearly, Ms. Bernhardt was very angry at the Debtor—someone who took her money, who did not do the work she contracted, who failed to refund her money, and who had dodged the forced satisfaction of his debt during her resort to the legal process.

Her anger was not unjustified. However, like it or not, bankruptcy does provide a refuge for irresponsible business people whose shoddy practices lead to their insolvency, as long as they have not done intentional wrong to a creditor and have not intentionally tried to subvert the bankruptcy process. To prevail on her challenge to the Debtor's resort to bankruptcy, Ms. Bernhardt had to produce convincing, on-

---

**23.** This obligation is a creation of BAPCPA, effective first in 2005.

point, and weighty evidence of one or the other of these things, to satisfy the governing law. Her anger alone could not suffice; and even her minute analysis of the inconsistencies and holes in the Debtor's court filings was not enough to make out a case for the drastic expedient of § 727(a)(4). Her case under § 523(a)(2) was adjudged insufficient at the close of her evidence. So, as bitter as the conclusion will be to her, there is no basis on which to deny the Debtor a discharge in bankruptcy.

## ORDER FOR JUDGMENT

On the foregoing memorandum decision,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that there is no basis under 11 U.S.C. 727(a)(4) on which to deny the Debtor a discharge in BKY 08–50192.

LET JUDGMENT BE ENTERED ACCORDINGLY, AND IN ACCORDANCE WITH THE ORDER ENTERED ON DECEMBER 8, 2008.